```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/26/08
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
IN RE CREDIT SUISSE FIRST BOSTON                03 Civ. 2467 (LAP)
CORP. (LANTRONIX, INC.) ANALYST                 **MEMORANDUM**
SECURITIES LITIGATION                           **OPINION & ORDER**
---------------------------------------X
THIS ORDER RELATES TO:
   ALL ACTIONS
---------------------------------------X

LORETTA A. PRESKA, United States District Judge:

Lead Plaintiff, Jerry Powers ("Plaintiff"), brings this class

action under sections 10(b) and 20(a) of the Securities Exchange

Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

promulgated thereunder by the Securities Exchange Commission, 17

C.F.R. § 240.10b-5, seeking recovery for losses sustained by

shareholders during the period from August 30, 2000 through

September 11, 2002 (the "Class Period"). Plaintiff alleges that

Defendant Credit Suisse First Boston Corp. ("CSFB") through its

predecessor, Donaldson Luftkin & Jenrette ("DLJ"), and CSFB's and

DLJ's analyst, Defendant Kevin A. McCarthy (the "analyst" or "Mr.

McCarthy"), issued false and misleading analyst reports

recommending that the investing public "buy" Lantronix, Inc.

("Lantronix" or the "company") common stock when Defendants' true

contradictory opinion was concealed from the investing public.

*See* Consolidated Amended Class Action Complaint (hereinafter

"Compl.") ¶ 2.

I.   Procedural History of the Motion

This case was transferred to this Court by the Honorable John

1

E. Sprizzo. By Order entered November 2, 2006, Judge Sprizzo certified the action to proceed as a class action and certified Plaintiff as the class representative. *See* Order, dated Nov. 2, 2006 [dkt. no. 03 Civ. 2467]. On December 15, 2006,[1] Defendants filed a Motion for Reconsideration in light of the Court of Appeals' decision in *Miles v. Merrill Lynch & Co. (In re: Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24 (2d Cir. 2006). Judge Sprizzo heard oral argument on this Motion and set a hearing to determine (1) whether analyst reports can have a sufficient effect on the market so as to invoke the fraud-on-the-market presumption from *Basic v. Levinson*, 485 U.S. 224 (1988), and (2) whether the analyst report in this case did in fact have an effect on the market so as to justify application of this presumption. This Court presided over the hearing at which the live testimony of three witnesses was presented in addition to various affidavits. For the reasons set forth herein, Defendants' Motion for Reconsideration and to decertify the class is granted.

II. Background

Lantronix designs, develops, and markets products that enable electronic devices to be controlled, configured, or reprogrammed over the Internet and/or intranets. *See* Compl. ¶ 17. DLJ served as a managing underwriter of Lantronix's initial public offering. *See*

---

[1] Defendants subsequently filed a Corrected Memorandum in Support of Motion of Defendants for Reconsideration of Order Granting Class Certification, dated Feb. 13, 2007.

*id.* ¶ 18. Lantronix went public on August 4, 2000 at $10 per share. *See id.* Based on analyst reports by Mr. McCarthy, Defendants issued three "buy" ratings for Lantronix stock on August 30, 2000, the first day of the Class Period; September 7, 2000; and September 21, 2000. *See id.* ¶¶ 19-21. Each included a 12-month target price of $17 per share. *See id.* Plaintiff alleges that Mr. McCarthy's reports regarding Lantronix were false and misleading because they were written not based on the company's merit but rather to please Lantronix and the investment bankers at DLJ. *See id.* ¶ 23. Specifically, Plaintiff alleges that Mr. McCarthy issued these reports in satisfaction of a promise made to the company in exchange for IPO underwriting business. *See id.* ¶ 27. Plaintiff further alleges that Mr. McCarthy made these positive recommendations despite internal memoranda noting that the company did not warrant such a recommendation. *See id.* ¶¶ 23-29. In fact, in a November 8, 2000 e-mail, Mr. McCarthy wrote that he "put [his] reputation on [the] line to sell this piece of crap calling favors from very important clients," that he "promised the company a report and we published one," and that "[t]his deal was an embarrassment to [him] and the firm and [he] wasted a lot of bullets to get it done." *See id.* ¶ 26. On November 3, 2000, CSFB acquired DLJ. *See id.* ¶ 9.

In May 2002, Lantronix announced that it had terminated its Chief Financial Officer and that it would be restating its financials for 2001 and 2002. *See* Corrected Affidavit of René M.

Stulz, dated Feb. 12, 2007 ("Stulz Aff."), ¶¶ 49-50. Two months later, it announced that the SEC had begun a formal investigation into the events leading to the restatement. *See id.* ¶ 50.

On September 5, 2002--some two years after Mr. McCarthy's ratings were issued--Lantronix issued an earnings report pre-announcement, which stated that it expected net losses for the fourth quarter between $60 million and $75 million and net fourth quarter revenue between $11.5 million and $12.5 million. *See* Affidavit of Avi Gesser in Support of Defendants' Motion for Reconsideration, dated Feb. 8, 2007 ("Gesser Aff."), Ex. B. The closing price for Lantronix stock that day was $0.78; the stock dropped $0.10 the following day to a closing price on September 6, 2002 of $0.68. *See id.*, Ex. A.

On September 12, 2002, Lantronix announced that actual losses for the fourth quarter were $72.5 million and that fourth quarter revenue was $11.5 million. *See* Affidavit of Catherine Lifeso in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification, dated May 8, 2006 ("Lifeso Aff."), Ex. G; Stulz Aff. ¶ 33. In addition to these figures, Lantronix announced that there would be restructuring charges and a 22% reduction in headcount; that more cash flow losses were anticipated; and that there would be no revenue growth during the next two quarters. *See* Stulz Aff. ¶ 33; Lifeso Aff., Ex. H.

Also on September 12, 2002, the last day of the Class Period, THE NEW YORK TIMES published an article which Plaintiff characterizes

4

as revealing that in 2000 Mr. McCarthy "advised investors to buy shares of a company that he acknowledged in an e-mail message were unworthy of purchase," that he was "stonewalled" from doing in-depth analysis of financial statements, and that investment bankers pressured him to write positively about the stock "even though the initial public offering had fallen flat." *See* Compl. ¶ 30. On that day, Lantronix stock dropped from $0.70 to $0.58 per share. *See id.* ¶ 31. The following day, it dropped further to $0.50, a two-day drop of 28%. *See id.*

III. Discussion

A. *Standard of Review*

The Court of Appeals recently clarified the standards governing a district judge in adjudicating a motion for class certification in *Miles v. Merrill Lynch,* 471 F.3d 24 (2d Cir. 2006). It concluded that

(1) a district judge may not certify a class without making a ruling that each Rule 23 requirement is met and that a lesser standard such as "some showing" for satisfying each requirement will not suffice, (2) that all of the evidence must be assessed as with any other threshold issue, [and] (3) that the fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met, although such a circumstance might appropriately limit the scope of the court's inquiry at the class certification stage.

*Id.* at 27. Under this rubric, a court must determine the existence of the four prerequisites under Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation, *see* Fed. R. Civ. P. 23(a), and two additional requirements under 23(b):

predominance, *i.e.*, that questions of law or fact common to the class predominate over questions affecting only individual members, and superiority of the class action over other methods, *see* Fed. R. Civ. P. 23(b). *See also Miles*, 471 F.3d at 32.[2] A court must engage in a "rigorous analysis" in making this certification decision. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

Because Judge Sprizzo did not have the benefit of this guidance from *Miles*, he heeded the earlier Court of Appeals' warnings against courts' reaching issues at the class certification stage that overlap with merits inquiries.[3] *See* Transcript, dated Oct. 24, 2006 (hereinafter "Class Cert. Tr.") at 25-26, 30, 39-40, 52, 56. *See also In re: Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *Caridad v. Metro-North Commuter*

---

[2] As discussed in further detail below, in this case, the disputed element is that of predominance--whether questions of law or fact common to the class predominate over questions affecting only individual members. Specifically, Defendants argue that the presumption of fraud-on-the-market found in *Basic* v. *Levinson*, 485 U.S. 224, 250 (1988), cannot be applied in this case, thus defeating Plaintiff's ability to show that the question of reliance on the alleged misstatements is common to the class.

[3] At the class certification stage, Plaintiff specifically made this argument to the Court. *See* Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification (hereinafter "Pl.'s Class Cert. Mem.") at 2 ("A court may not examine the merits of plaintiff's claims at the class certification stage.").

The Court of Appeals' holdings in *Caridad* and *Visa Check*, which apparently stem from the Supreme Court's suggestion in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974), that Rule 23 does not give the court authority to make a preliminary inquiry into the merits in order to determine whether its requirements are met, misunderstood that language. *See Miles*, 471 F.3d at 33-36. In *Miles*, the Court of Appeals noted that *General Telephone*, in which the Supreme Court held that a "rigorous analysis" is required and recognized that "'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action'" is, in fact, the "principal" decision in determining the requirements for class certification. *See id.* at 32-33 (quoting *Gen. Tel.*, 457 U.S. at 160-61).

*R.R.,* 191 F.3d 283, 291 (2d Cir. 1999).[4] Upon this recent clarification, this Court now reconsiders Judge Sprizzo's certification of the class.

In order to decide whether or not to decertify this class, the Court must determine whether Plaintiff has carried his burden of demonstrating that each element of Rule 23 is met by a preponderance of the evidence. *See Miles,* 471 F.3d at 42; *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 233 (2d Cir. 2006). *See also* Fed. R. Civ. P. 23(a); *Caridad,* 191 F.3d at 291 (noting that the party seeking certification bears the burden of demonstrating these elements). As these issues are mixed questions of law and fact, *see Miles,* 471 F.3d at 40, a hearing was held on the Rule 23(b) issue of predominance in order to make a "definitive assessment . . . notwithstanding . . . overlap with merits issues," *see Miles,* 471 F.3d at 41.

B. *Analyst Reports and the Fraud-on-the-Market Presumption*

The central disputed issue in this case is whether the fraud-on-the-market presumption of reliance adopted in *Basic,* 485 U.S. at 250, is applicable. The fraud-on-the-market presumption encompasses the characteristics of the modern securities market by acknowledging that the market "transmits information to the investor in the processed form of a market price." *See Basic,* 485

---

[4] In addition to clarifying the rule regarding issues that overlap with the merits, *Miles* explicitly overruled the *Caridad* standard that plaintiffs must make "some showing" of an element of class certification. *See Miles,* 471 F.3d at 40; *Caridad,* 191 F.3d at 292.

U.S. at 244 (citations omitted). Supported by "common sense and probability," it holds that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *See id.* at 246-47. Defendants argue that the fraud-on-the-market presumption of reliance does not apply in this case as the alleged misstatement was not made by the issuer of the stock, but rather by an analyst. Absent the application of this presumption in this case, each individual plaintiff would be required to prove reliance on the alleged misstatements, and individual questions would clearly predominate over common questions, defeating the predominance requirement of Rule 23(b) and requiring decertification of the class.

1. *Relevant Case Law*

The Court of Appeals provided some limited guidance on whether the *Basic* presumption applies to analyst cases in *Hevesi v. Citigroup, Inc.,* 366 F.3d 70 (2d Cir. 2004), which granted defendant Citigroup's petition to file an interlocutory appeal of Judge Cote's grant of class certification in *In re Worldcom, Inc. Sec. Litig.,* 219 F.R.D. 267 (S.D.N.Y. 2003). However, the underlying case settled before final determination on appeal. Lower courts have since referenced *Hevesi* for two points: (1) it seemed to look favorably upon the Seventh Circuit's determination in *West v. Prudential Secs., Inc.,* 282 F.3d 935, 937 (7th Cir.

2002), that the fraud-on-the-market presumption should not apply when a stockbroker privately informs clients of false information, and (2) it explicitly noted Judge Cote's application of the fraud-on-the-market presumption in a novel case without identification of a causal link between the statements complained of and the price of the stock. *Hevesi*, 366 F.3d at 78-79. As to this second point, the Court of Appeals cited in a footnote the opinion of Professor John C. Coffee, Jr. of Columbia Law School, a "prominent scholar of federal securities law," who stated that the presumption is only fairly applicable in cases "where the publication of the [analyst] report clearly moved the market in a measurable fashion." *Id.* at 79 n.7. Additionally, the Court of Appeals suggested that extending the presumption to analyst cases "would extend the potentially coercive effect of securities class actions to a new group of corporate and individual defendants." *Id.* at 80.

Recently, the Court of Appeals in *Miles* stated that it is "doubtful whether the *Basic* presumption can be extended, beyond its original context, to tie-in trading, underwriter compensation, and analysts' reports." *Miles,* 471 F.3d at 43 (citation omitted). Ultimately, the Court of Appeals decertified the class based on the absence of an efficient market and thus declined to rule on this issue. *See id.* at 42-43. This issue is currently before the Court of Appeals in *In re: Salomon Analyst Metromedia Litig.*, 06 Civ.

3225. With this limited guidance, other courts in this district have come to various conclusions on the issue.[5]

## 2. *Whether Analyst Reports Can Affect the Market*

No Court of Appeals has ever held that the *Basic* presumption applies to research analyst statements. Indeed, the Court of Appeals' brief foray into this question cautiously suggested that there may in fact be some hesitancy to apply the *Basic* presumption to such cases or at least resistance to applying it in the same manner. *See Hevesi*, 366 F.3d at 78-79, 79 n.7; *Miles*, 471 F.3d at 43. Conversely, no Court of Appeals has ever refused to apply the *Basic* presumption to research analyst statements.

The Court need not answer this question because its determination as to the next question obviates the need to reach this issue.

## 3. *Whether This Analyst Report Affected the Market*

Plaintiff argues that "[t]here is nothing in *Basic* or the text

---

[5] *See, e.g. DeMarco v. Lehman Bros. Inc.*, 222 F.R.D. 243, 246-47, 249 (S.D.N.Y. 2004) (Rakoff, J.) (hereinafter *DeMarco I*) (denying class certification, noting the "qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst" and holding that "the 'fraud-on-the-market' doctrine applies in a case premised on a securities analyst's false and fraudulent opinions or recommendations only where the plaintiff can make a showing that the analyst's statements materially impacted the market price in a reasonably quantifiable respect"); *DeMarco v. Robertson Stephens, Inc.*, 228 F.R.D. 468, 474, 476 (S.D.N.Y. 2005) (Lynch, J.) (hereinafter *DeMarco II*) (certifying the class and refusing to adopt a higher standard to invoke the fraud-on-the-market presumption when the misleading statements were made by analysts); *Fogarazzo v. Lehman Brothers. Inc.*, 232 F.R.D. 176, 184, 190 (S.D.N.Y. 2005) (Scheindlin, J.) (certifying the class and holding that the fraud-on-the-market presumption did not depend on who made the statement but, rather, on whether it was material); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 220, 223-24 (S.D.N.Y. 2006) (Lynch, J.) (granting class certification in the underlying case and expressly refusing to reconsider his declining to adopt a higher standard for plaintiffs alleging fraud by analysts).

of Rule 23 which requires a higher standard requiring a prima facie showing" that Defendants' analyst reports moved the market.[6] *See* Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification (hereinafter "Pl.'s Class Cert. Mem.") at 16. *See also DeMarco II*, 228 F.R.D. at 474. He further argues that Defendants' reputation in the market and prominence as managing underwriter for Lantronix alone are sufficient, *see* Pl.'s Class Cert. Mem. at 17, and that once a material statement in an efficient market is shown, nothing more is required; whether the market was moved is irrelevant at this stage, *see* Plaintiff's Post-Hearing [Proposed] Findings of Fact and Conclusions of Law (hereinafter "Pl.'s Post-Hrg. Br.") ¶¶ 3-4 (Conclusions of Law).

Defendants suggest that in order to extend the *Basic* presumption beyond issuer statements to analyst reports,[7] Plaintiff "must show a causal link between Defendants' statements and movements in the price of Lantronix securities." *See* Defendants' Opposition to

[6] Although Plaintiff argues that the presumption has in fact been established in this case, he concedes that in order to rebut the elements giving rise to the presumption, Defendants must show that the misrepresentation did not lead to a distortion in market price. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Reconsider the Order Granting Class Certification (hereinafter "Pl.'s Opp'n to Recons.") at 10. Defendants argue that Plaintiff himself has rebutted the presumption through his experts. *See* Reply Memorandum in Further Support of Motion of Defendants for Reconsideration of Order Granting Class Certification (hereinafter "Defs.' Recons. Reply") at 2. At the hearing, however, Plaintiff suggested that the class certification stage was not the appropriate time or place to determine whether this analyst had any effect on the market but that this Court should only determine whether, as a general matter, the analyst report is considered material information. *See* Transcript, dated Oct. 30, 2007 (hereinafter "Hrg. Tr.") at 18-19.

[7] *Basic* did not expressly limit the presumption to issuer statement cases, but in that case, the statement was, in fact, made by an issuer. *See Basic*, 485 U.S. at 227, 247 ("an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").

11

Plaintiff's Motion for Class Certification (hereinafter "Defs.' Opp'n to Class Cert.") at 6.[8] They ground this argument in *Hevesi's* discussion of *West*, as noted above. In that case, however, the Court of Appeals refused to determine specifically the necessary evidentiary showing incumbent upon plaintiffs to extend the *Basic* presumption to analyst cases. *See Hevesi,* 366 F.3d at 79. Nevertheless, Defendants note that the Court of Appeals "questioned the propriety of presuming that analyst statements distort market price" in its citation of Professor Coffee's opinion that analyst and issuer statements should be treated differently. *See* Defs.' Opp'n to Class Cert. at 6 n.1; *Hevesi*, 366 F.3d at 79 n.7. Defendants also note that they are not aware of any decision that has certified a securities fraud class without some expert evidence that the reports actually affected the market price of the securities at issue, *see* Defs.' Opp'n to Class Cert. at 7, and suggest that "[a]t the very least . . . the extension of the fraud-on-the-market theory to analysts' statements must be conditioned on

---

[8] *See also Ray v. Citigroup Global Markets, Inc.,* 482 F.3d 991, 995 (7th Cir. 2007) (affirming a grant of summary judgment and requiring plaintiffs to show that "defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception" to engage the fraud-on-the-market presumption); *In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 13, 19 (1st Cir. 2005) (vacating district court's certification of the class and rejecting definition of market efficiency that "allows some information to be considered 'material' and yet not affect market price"); *Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 659, 663 (5th Cir. 2004) (affirming grant of partial summary judgment for defendants as to alleged misstatements that did not lead to "actual movement" in market price of the stock); *In re: Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425, 1435 (affirming the district court's dismissal and stating that "because the market . . . was 'efficient' and because . . . the disclosure had no effect on [the stock's] price, it follows that the information disclosed . . . was immaterial as a matter of law.").

12

a showing that the analysts' allegedly false statements 'materially and measurably impacted the market price of the security . . .,'" see Proposed Findings of Fact and Conclusions of Law in Support of Motion of Defendants for Reconsideration of Order Granting Class Certification (hereinafter "Defs.' Post-Hrg. Br.") ¶ 14.[9] Because no binding precedent precludes the Court from holding that an analyst statement can affect the market so as to invoke the Basic presumption; the Court of Appeals has at least loosely suggested the need for a higher standard in such cases; and analyst statements are, at least in some respects, different from those of issuers, the Court now proceeds to determine whether this analyst's statements did, in fact, affect the market.[10]

Even assuming that the presumption can be applied to analyst cases generally, Plaintiff has failed to make a sufficient showing

---

[9] Defendants cite to Lentell v. Merrill Lynch, 396 F.3d 161, 176 (2d Cir. 2005) for the proposition that a plaintiff must show that defendants' statements caused artificial inflation in the stock price. See Defs.' Opp'n to Class Cert. at 8-9. In reviewing loss causation in that case, however, the Court of Appeals criticized plaintiffs' failure to allege "loss resulting from the market's realization that the opinions were false, or that [defendants] concealed any risk that could plausibly . . . have caused plaintiff's loss." See Lentell, 396 F.3d at 176. In this case, Plaintiff very clearly hangs his theory of loss causation on the market's reaction to THE NEW YORK TIMES article revealing the allegedly concealed information. See Affidavit of Candace L. Preston, CFA ("Preston Aff."), ¶ 19.

[10] Because the Court finds that, when considered together, the evidence offered by both parties falls short of satisfying even a minimal standard of proof regarding market distortion, the Court need not make a determination as to whether, as Professor Coffee has suggested and Judge Rakoff has held, a higher standard should be applied to analyst cases. See John C. Coffee, Jr., Security Analyst Litigation, N.Y.L.J., Sept. 20, 2001, at 5; DeMarco I, 222 F.R.D. at 247 (holding that plaintiff must "make a showing that the analyst's statements materially impacted the market price in a reasonably quantifiable respect.").

13

that it is applicable in this particular case.[11]  With the benefit

of ample evidence, including both written affidavits and oral

testimony, that demonstrates the absence of market impact,[12] the

Court finds that the *Basic* presumption is not properly applicable

here and thus that Plaintiff has not carried his burden of

demonstrating that the elements of Rule 23(b) have been satisfied.[13]

a. *Market Impact of the Analyst Reports at the Beginning of the*

*Class Period*

Both parties agree, and this Court finds, that there were no

statistically significant abnormal market returns following issuance

---

[11] In the alternative, if Plaintiff's showing is sufficient to establish the presumption, Defendants have rebutted it here. The *Basic* Court noted the lower court's holding that the presumption could be rebutted by a showing that the misrepresentation did not in fact lead to a distortion of the stock price, but then proceeded to cite a number of ways to rebut the presumption without specifically adopting or rejecting the method suggested by the lower court. *See Basic*, 485 U.S. at 248.  Here, Plaintiff has proffered evidence which, if credited, would constitute a modest showing of market impact. This showing, when weighed against Defendants' opposing evidence, is insufficient to persuade the Court that the *Basic* presumption is applicable to this case. Regardless of the procedural posture of Plaintiff's showing and Defendants' rebuttal, the *Miles* Court was clear that a "district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met." *See Miles*, 471 F.3d at 42.

[12] Defendants do not challenge market efficiency, but only market impact. *See* Hrg. Tr. at 117.

[13] Plaintiff suggests, and some courts have held (prior to *Miles*), that a plaintiff's burden is not to show that the *Basic* presumption applies, but to show that common issues predominate. *See* Class Cert. Tr. at 47. *See also Fogarazzo*, 232 F.R.D. at 185 (refusing to require a showing of damages, requiring only a showing that questions of causation can be resolved on a common basis). He notes that whether the *Basic* presumption applies is an issue common to the whole class. *See* Class Cert. Tr. at 47.  Although Judge Sprizzo initially agreed with Plaintiff at oral argument on class certification, *see id.*, *Miles* has since made abundantly clear that the requirements of Rule 23 "must be met, not just supported by some evidence," that the 2003 amendments to Rule 23 make clear that a more extensive inquiry is now appropriate, and that "the ultimate issue as to each requirement is really a mixed question of fact and law." *See Miles*, 471 F.3d at 33, 39-40.  These principles indicate that the ultimate question is not simply a theoretical one, but a factually sensitive inquiry into the application of the presumption itself.

14

of Defendants' three reports.[14] *See* Stulz[15] Hrg. Tr. at 33; Preston
Aff. ¶ 18. On the day after Defendants initiated their positive
coverage of Lantronix with their first analyst report, the stock
price actually dropped 0.59%. *See* Stulz Aff. ¶ 20; Stulz Hrg. Tr.
at 33. On the days on which Defendants' second and third reports
were issued, Lantronix stock rose by roughly 3.6% and 2%,
respectively; these reports contained the same "buy" rating and
price target. *See* Stulz Aff. ¶¶ 22, 24-25. The experts agree that
analyst reports that reiterate ratings and price targets contained
in previous reports generally do not affect stock price, *see* Stulz
Hrg. Tr. at 29; Preston Hrg. Tr. at 138-40, and the Court finds that
these returns likely represent "just random fluctuations in the
stock price." *See* Class Cert. Tr. at 15. *See also* Stulz Aff. ¶ 7(a)
(stating his expert opinion that the analyst reports had no impact
on the stock price of Lantronix).

Plaintiff argues that the lack of evidence of measurable market
impact at the beginning of the Class Period is immaterial because,
in his view, this is an omissions case. Specifically, Plaintiff
argues that Defendants' failure to reveal their true opinion of
Lantronix stock was an omission and that the impact of an omission
cannot be measured. *See* Plaintiff's Memorandum in Opposition to

---

[14] To prove that a stock was responding to a specific piece of information on a
specific day under the generally accepted event study approach (1) the return
must be abnormal; (2) the abnormal return must be significant; and (3) there must
not be confounding news. *See* Stulz Aff. ¶¶ 9-16.

[15] Each citation to testimony in the Hrg. Tr. will begin with the name of the
witness.

15

Defendants' Motion to Reconsider the Order Granting Class Certification (hereinafter "Pl.'s Opp'n to Recons.") at 11-13. Accordingly, Plaintiff argues that reliance is presumed in the case of a material omission. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). The rationale behind the *Ute* exception is that in true omissions cases reliance is impossible to prove. *See In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. at 218-19. Because this case is based on several affirmative statements as to the value of Lantronix stock, which are now alleged to be false based on conflicting internal correspondence, Plaintiff's argument here is weak. The Court of Appeals has instructed that where a "[p]laintiff's principal objection to the omissions . . . is that the omissions exacerbated the misleading nature of the affirmative statements," *Ute* will not apply. *See Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005). Accordingly, the Court is not persuaded by this new argument and will continue to treat this case as one involving misstatements, rather than omissions.

Alternatively, Plaintiff asserts an effect on the price of the stock in the absence of movement of the price.[16] Although admitting that there was no measurable market impact at the time the analyst reports were issued, *see* Preston Aff. ¶ 18, Plaintiff's expert, Ms. Candace L. Preston, asserts that "[a]n analyst report can affect a

---

[16] This conforms to Plaintiff's initial allegation that the price of the stock was "artificially inflated and/or artificially maintained." *See* Compl. ¶ 32.

stock price without causing a movement."[17] *See* Preston Hrg. Tr. at 148; Preston Aff. ¶ 18. Ms. Preston reasons that the analyst reports served as "booster shots" to "stave off a decline in the price." *See* Preston Aff. ¶ 16; Preston Hrg. Tr. at 128. Ms. Preston also testified that although these post-quiet period reports would have been "confirmatory" and "[t]here would be no reason to expect that information to move the market," they were material. *See* Preston Hrg. Tr. at 126. Mr. McCarthy conceded that the projections he submitted in the first report were the same projections he had previously disclosed to the market during the pre-IPO road show process. *See* McCarthy Hrg. Tr. at 95. This absence of a measurable market impact at the beginning of the Class Period conforms to the general rule --accepted by both experts--that initiating reports of affiliated analysts and confirmatory analyst statements do not have any impact on stock prices. *See* Stulz Hrg. Tr. at 30-32; Preston Hrg. Tr. at 150; Defs.' Post-Hrg. Br. at ¶ 2. *See also* John C. Coffee, Jr., *Security Analyst Litigation*, N.Y.L.J., Sept. 20, 2001

---

[17] In fact, Judge Sprizzo acknowledged at the oral argument for class certification that "[w]e don't know what would have happened in the market if the statements had not been made, either . . . suppose the stock would have gone ten points lower if the statement had not been made . . . it's not dispositive that the stock did not go up immediately upon the making of the statement." *See* Class Cert. Tr. at 17-18.

The Court of Appeals for the Fifth Circuit acknowledged in *Nathenson v. Zonagen, Inc.,* 267 F.3d 400 (5th Cir. 2001), that "in certain special circumstances public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change." *Id.* at 419. The court followed this language with an example of a statement falsely confirming information that the market was expecting. *Id.* This case does not present such special circumstances.

17

at 4 ("Although there are exceptions, analyst reports do not typically move the market price of a stock, at least not when the analyst is associated with the underwriter to the issuer."). Defendants' expert, Dr. René M. Stulz, also testified, based on the academic literature, that the absence of a report would likewise have no effect on the market.[18] See Stulz Hrg. Tr. at 58-59. In contrast, Plaintiff's expert asserted that it would have been "extraordinary" and "cataclysmic" if one of the co-lead underwriters did not issue an analyst report after the quiet period. See Preston Hrg. Tr. at 127-28. Ultimately, however, as even Plaintiff's expert conceded, there is no way to test for this maintenance effect, and Plaintiff's expert knew of no evidence to support this maintenance theory. See id. at 152.

First, as a matter of fact, the Court is not persuaded that the absence of a report would have an effect on the market. Because, as both experts testified, there is no way to test for the "booster shot" theory espoused by Ms. Preston, the Court does not credit her testimony on that theory. Rather, the Court is persuaded by Dr. Stulz's testimony to the contrary. See Stulz Hrg. Tr. at 59 (discussing Bradley's article[19] to the effect that, in the absence

---

[18] Defendants' expert discussed an article that concluded that the market is not surprised by reports, such as those at issue here, by lead underwriters immediately after the quiet period. See Stulz Hrg. Tr. at 57-58. This same article notes, however, that in its study, 53 of 56 underwriters issued a report within five days after the quiet period. See id. at 58-59.

[19] Daniel J. Bradley et al., The Quiet Period Goes out with a Bang, THE JOURNAL OF FINANCE, Vol. LVIII, No.1 (Feb. 2003).

of a report by an affiliated analyst, stock price remained flat at the end of the quiet period).

Second, as a matter of law, this price maintenance theory is patently deficient under *Miles*, which held that Rule 23 determinations must be based on "relevant *facts*." *See Miles,* 471 F.3d at 41 (emphasis added). *See also In re: Northern Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 460 (S.D.N.Y. 2000). Because, as Plaintiff's expert concedes, there is no way to test her inoculation theory, it is based not on facts but on speculation. Weighing all of the evidence, the Court finds that Defendants' reports had no impact on the price of the stock at the time they were issued.[20]

b. *Dissipation of any Effect of the Analyst Reports Throughout the Class Period*

Assuming *arguendo* that Defendants' analyst reports had an effect on the market at the time of their issuance, the Court is easily persuaded that any such effect had dissipated long before the close of the Class Period. As the Supreme Court in *Basic* recognized, new information about publicly traded companies is constantly being absorbed by the market. *See Basic*, 485 U.S. at 241-42. By the 2002 publication of the subject article in THE NEW YORK

---

[20] Even if there had been some effect, it is not clear that any such effect would be attributable to Defendants' reports. Lehman Brothers, Inc. initiated coverage the same day with a "buy" rating and a 12-month price target of $20, $3 higher than Defendants' $17 price target. *See* Lifeso Aff., Ex. E. Additionally, Lantronix released its fourth quarter results for 2000 after the market closed on September 6, 2000, immediately prior to Defendants' second report. *See* Lifesco Aff., Ex. F.

19

TIMES, Defendants' reports were stale, as they had either expired on their own terms or been superceded.[21] *See* Stulz Aff. ¶ 7(c); Stulz Hrg. Tr. at 39; Defs.' Post-Hrg. Br. ¶ 5. The fact that the market price of the stock had tumbled substantially in the two years between issuance of the initial report and the article lends further support to this conclusion. *See In re: IPO Sec. Litig.,* 227 F.R.D. 65, 114 (S.D.N.Y. 2004), *vacated and remanded by Miles*, 471 F.3d 24 ("when an artificially inflated stock tumbles to a fraction of its offering price, it is logical to assume that the artificial inflation has dissipated").

First, Defendants' reports were self-limited by an express disclaimer that "opinions and estimates expressed herein constitute our judgment as of the date appearing on the report and are subject to change without notice," *see* Preston Hrg. Tr. at 146; Lifeso Aff., Exs. A-C, and contained 12-month time limits,[22] *see* Stulz Tr. at 41.

[21] At the oral argument for the Motion to Dismiss, Judge Sprizzo stated that "[w]hether it is self-limiting and whether it is self-limiting in the market are two different questions because you published the statements saying you no longer rely on the buy recommendation, they expired. If you had, it would save it. You didn't. It's still in the market." *See* Transcript, dated Dec. 13, 2005 (hereinafter "Mot. to Dismiss Tr.") at 6.

Defendants filed a Motion to Dismiss on the following grounds: (1) failure to allege transaction causation, (2) failure to allege loss causation, and (3) failure to allege any misrepresentation or omission. *See* Motion to Dismiss, dated Aug. 22, 2005. The Court denied that Motion by Order dated Dec. 16, 2005. Defendants now argue that "there's absolutely no chance that anybody in the market is relying on these statements." *See* Class Cert. Tr. at 19. Delving into this question was not appropriate at the Motion to Dismiss stage because the Court was deciding a legal question. *See* Mot. to Dismiss Tr. at 11-14, 18-19. At this class certification stage, according to the Court of Appeals, the Court is deciding what is both a legal and factual question. *See Miles*, 471 F.3d at 40.

[22] Plaintiff argues that these 12-month limitations only applied to the price targets, not the "buy" rating. Defendants, however, offered evidence of the imposition of a similar 12-month limit on this rating in a DLJ fact book, *see* Stulz Hrg. Tr. at 41, though they failed to offer evidence regarding the distribution of this fact book. Regardless, it is clear that the (continued)

20

The Court of Appeals has held that where an alleged misstatement "reflected only the speaker's opinion on the fate of the dividend in the near term" and was so limited on its face, "[i]t would be unreasonable, as a matter of law, for an investor to rely on these projections as long-term guarantees . . . ." *See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998). That principle is equally applicable here. At best for Plaintiff, Defendants' reports opined on Lantronix's twelve-month target share price, that is, the share price as of September 21, 2001--about a year before the end of the Class Period.[23]

Second, Defendants have offered powerful evidence of copious intervening information released to the market. Not only had "the investment thesis on which [Defendants] predicated [their] opinions in 2000 . . . significantly changed by 2002," *see* Defs.' Post-Hrg. Br. ¶ 7, but the market had also incorporated this updated information and analysis. The Court is persuaded by the testimony of Dr. Stulz and Mr. McCarthy that, in general, the market would naturally rely more heavily on the most recent information, *see* McCarthy Hrg. Tr. at 40; Stulz Hrg. Tr. at 44, and that investors would not rely on an analyst statement older than one quarter,

(continued from preceeding page) price-targets had expired on their own terms and that even absent similar evidence regarding the "buy" rating, its effect had also dissipated.

[23] The Court also notes that DLJ merged into CSFB on November 3, 2000, *see Compl.* ¶ 9; Stulz Hrg. Tr. at 39, and CSFB never initiated coverage of Lantronix, *see* Stulz Hrg. Tr. at 39. Thus, the Court credits Dr. Stulz's testimony to the effect that, as a result, "there wasn't an institution out there reminding people of the rating." *See id.* at 40.

*see* McCarthy Hrg. Tr. at 13. Indeed, as Mr. McCarthy testified persuasively, this general tendency is magnified here because Lantronix is a rapidly changing technology company. *See* McCarthy Hrg. Tr. at 112 ("And especially in technology, technology companies, things are changing so rapidly that once you get beyond one quarter . . . -- you wouldn't want to read a report that didn't reflect the most current quarter because then you would be out of date already.").

More specifically, between the issuance of Defendants' reports and publication of the article in 2002, Lantronix had issued numerous statements including actual numbers as well as the company's own projected numbers.[24] The numbers contained in these statements completely undermined any projections based on data from months prior. For example, in August 2001, Lantronix announced its expectation of 2002 earnings per share at \$0.30 to \$0.35, *see* Press Release, Lantronix, Inc., Lantronix, Inc. Announces Record Results for Fiscal Fourth Quarter And Year End 2001 (Aug. 8, 2001) ("Aug. 2001 Press Release"); Stulz Hrg. Tr. at 40; Stulz Aff. ¶ 42; a few months later it predicted earnings per share at \$0.20 to \$0.24, *see* Press Release, Lantronix, Inc., Lantronix, Inc. Announces Record Revenues for Fiscal First Quarter 2002 (Oct. 31, 2001) ("Oct. 2001 Press Release"); Stulz Aff. ¶ 44. In February 2002, it announced

[24] Lantronix released at least 42 separate SEC filings, including 10-K annual reports for 2000 and 2001 and subsequent revenue restatements for 2001 and 2002. *See* Lifeso Aff., Exs. I-L. These restatements apply to the period going back before the analyst reports were issued. *See* Class Cert. Tr. at 19.

expected earnings per share for 2002 to be between $0.05 and $0.06. *See* Press Release, Lantronix, Inc., Lantronix, Inc. Announces Fiscal Second Quarter 2002 (Feb. 6, 2002) ("Feb. 2002 Press Release"); Stulz Hrg. Tr. at 42; Stulz Aff. ¶ 45. Finally, in May 2002, Lantronix reported pro forma earnings per share of -$0.04 for the third quarter and expected earnings per share in the fourth quarter of a $0.02 to $0.04 loss. *See* Press Release, Lantronix, Inc., Lantronix, Inc. Announces Fiscal Third Quarter 2002; Q3 2002 Device Business Net Revenues Advance 17.1% Over Last Year's Quarter (May 1, 2002) ("May 2002 Press Release"); Stulz Aff. ¶ 46. Furthermore, in August 2001, Lantronix estimated that 2002 revenues would be between $105 and $120 million, *see* Aug. 2001 Press Release; Stulz Aff. ¶ 42, but by October 2001, Lantronix lowered this estimate to $87 to $92 million, *see* Oct. 2001 Press Release; Stulz Aff. ¶ 44. In February 2002, it further lowered this estimate to $65 to $67 million. *See* Feb. 2002 Press Release; Stulz Hrg. Tr. at 42; Stulz Aff. ¶ 45. Finally in June 2002, Lantronix announced that investors could expect revenues to be around $60 million for that year. *See* Press Release, Lantronix, Inc., Lantronix Files Third Fiscal 2002 Quarter Results and Restated Financial Results for the Year Ended June 30, 2001, First and Second Quarters of Fiscal 2002 (June 5, 2002); Stulz Aff. ¶ 47.

In addition to Lantronix's own statements, other analysts had issued more current reports, and, in fact, Defendants' reports were

23

some of the most pessimistic. For example, the consensus earnings per share was $0.39 in May 2001,[25] which is substantially higher than Defendants' $0.25 earnings per share forecast. *See* Stulz Hrg. Tr. at 40. *See also* Stulz Aff. ¶ 43. This intervening information and the logical inferences regarding an efficient market's reaction to it persuades the Court that any possible effect of Defendants' reports on the market had dissipated by the close of the Class Period.

In addition to the company's 2001 results and estimates, Lantronix underwent significant change in 2002 that destroyed the investment thesis on which Defendants' statements were based. Defendants' August 30 and September 21, 2000 reports forecast a "hockey stick-like acceleration in sequential revenue growth in 2002 . . . ." *See* Lifeso Aff., Exs. A at 3 & C at 11. Between May and July of 2002, however, Lantronix terminated its Chief Financial Officer; both the Chairman of the Board and the Chief Executive Officer resigned; the company announced it would be restating its financials for 2001 and 2002; and the SEC began a formal investigation into the events leading to the restatement. *See* Stulz Aff. ¶¶ 49-50. As Dr. Stulz testified persuasively, these post-September 2000 developments in the market and at Lantronix

[25] Reuters News reported the current average estimate from analysts as $0.29 earnings per share on May 16, 2001. *See Lantronix cancels plans to acquire Lightwave*, REUTERS NEWS, May 16, 2001. This report does not diminish the testimony of Dr. Stulz based on this additional report, as the average earnings per share estimate could vary throughout the month and as the $0.29 earnings per share reported in this article is still notably higher than Defendants' $0.25 earnings per share forecast.

destroy[ed] the investments thesis of DLJ because the [w]orld is not evolving in the way DLJ expected.

There is no evidence of this [expected] hockey stick pattern. In fact, it is a reverse hockey stick pattern at that point and that's due to a number of factors, some having to do with industry forces, some having to do with difficulties within Lantronix.

*See* Stulz Hrg. Tr. at 42-43. Thus, the Court agrees with Dr. Stulz's summary that "the picture that Lantronix itself is drawing of the fiscal year 2002 is completely inconsistent with the forecast that DLJ had . . . published in 2000.[26] *Id.* at 42. Accordingly, the Court is persuaded that Lantronix had become a very different company in 2002 from the one on which Defendants opined in 2000--its share price had already dropped by 90%, management guidance and analyst expectations had been drastically reduced, and it faced an SEC inquiry and had experienced a restatement, a wholesale replacement of management and a change in accounting practices. *See* Stulz Aff. ¶ 35-53; Reply Decl. of René M. Stulz, dated April 26, 2007, ¶¶ 4, 5 & n.4, 29-30; Stulz Hrg. Tr. at 43-44. In sum, the Court agrees with Dr. Stulz that "[i]t is inconceivable . . . that anybody [in 2002] would still be paying attention to those reports

---

[26] Ms. Preston's characterization of pre-September 2002 results at Lantronix is not to the contrary:

At this point the company--we have seen a company that has relatively well survived the real severe downturn in the Nasdaq market. Then we discover, when we get to February on this graph, the company announces poor earnings. That's problematic for sure, causes the stock to go down significantly.

Then we get to May and we find out, oh, that not only does the company have poor earnings, that the CFO has been forced to resign, that we are restating and that we are under an SEC investigation.

All of those things cause the stock price to drop from approximately $6 to just before the New York Times [sic] article, 70 cents.

*See* Preston Hrg. Tr. at 130.

[from 2000]." *See* Stulz Hrg. Tr. at 44.

Plaintiff argues that the omitted information--Defendants' true opinion of Lantronix--was not stale by 2002[27] and that the fact that the stock did in fact drop after this article "itself provides a *prima facie* showing of market impact." *See* Lead Pl.'s Reply Br. in Supp. of Class Certification at 8. The Court is still not persuaded by Plaintiff's argument or by Ms. Preston's testimony that "the drop that would have occurred had the truth been timely disclosed can be measured by looking at the price drop when the omitted information is revealed." *See* Preston Hrg. Tr. at 129, 151. *See also* Stulz Hrg. Tr. at 60-62.

To the contrary, as noted above, the Court is persuaded that the avalanche of information released during the Class Period rendered the Defendants' reports from 2000 wholly irrelevant and that, as explained below, it was the negative earnings information released on September 12, 2002, and not the article in THE NEW YORK TIMES, that caused the drop in Lantronix's stock price on September 12 and 13, 2002.

---

[27] Plaintiff's expert testified that if this information had been released back in August or September of 2000, it "would have decimated the stock . . . it would have been cataclysmic." *See* Preston Hrg. Tr. at 128. Though this issue is not to be resolved at this stage, it should be noted that Mr. McCarthy disputes the suggestion that he held these views in August of 2000 and points to the fact that the e-mails were not written until November 2000. *See* McCarthy Hrg. Tr. at 100.

26

*c. Market Impact at the End of the Class Period*

As there is insufficient evidence of market impact of the Defendants' reports at the beginning of the Class Period and complete dissipation of any relevance they may have held throughout the Class Period, the Court will only briefly address the natural extension of these findings--that there is correspondingly insufficient evidence of market impact at the close of the Class Period.[28]

Ms. Preston asserted that THE NEW YORK TIMES article shredded the remaining credibility of the company, *see* Preston Hrg. Tr. at 129-30, but she did not argue that it demonstrated anything about the remaining impact of the analyst reports. Dr. Stulz testified more credibly that for this information to affect stock price, it would have to affect the market's perception of the future cash flows of the company. *See* Stulz Hrg. Tr. at 37. The article did not address future cash flows but rather the credibility of a company that Plaintiff's expert agreed had very little remaining credibility. *See* Preston Hrg. Tr. at 129-30. Thus Ms. Preston's testimony on this point is not persuasive.

Plaintiff also argues that there was "no new negative information" introduced to the market on September 12, 2002 other

---

[28] Indeed, this Court credits Dr. Stulz's testimony to the effect that for THE NEW YORK TIMES article to have had an effect on Lantronix's share price in 2002, the Defendants' reports from 2000 must still have been affecting the share price, but, because the Defendants' reports had no effect on the company's share price in 2000, they could not have had an impact two years later when the article was published. *See* Stulz Hrg. Tr. at 37-39.

than that contained in THE NEW YORK TIMES article, *see* Pl.'s Opp'n to Recons. at 14, that all negative news had been pre-announced, *see* Pl.'s Post-Hrg. Br. ¶ 17, and that the "real news" was in THE NEW YORK TIMES article, *see* Pl.'s Post-Hrg. Br. ¶ 17. The Court disagrees. First, the Court agrees with Dr. Stulz that there was material new negative information announced by the company on September 12. As he summarized:

> However, even though there was a pre-announcement, the earnings report of September 12 contained material new information. A partial list of the information that was announced in the September 12 press release but not in the September 5 press release includes:
>
> - A net loss for the fourth quarter of $72.5 million, which is towards the upper end of the range of the pre-announced loss estimate.
> - Net revenue for the fourth quarter of $11.5 million, which is at the bottom end of the range of the pre-announced net revenue estimate.
> - A restructuring program that was expected to result in a one-time charge of $3 to $5 million in the first quarter of fiscal 2003, and reduce headcount by 22%.
> - A charge of $5.9 million to reflect the impairment of goodwill arising from the acquisition of United States Software Corporation. Lantronix acquired that corporation in 2000.
> - Other one-time charges of approximately $12 million.
> - Other forward-looking commentary, such as
>   ". . . we expect to experience some continuing losses and negative cash flow in the first half of the fiscal year . . . ."

Stulz Aff. ¶ 33 (citation omitted). The Court also credits his evaluation of the significance of that new information to investors:

28

To evaluate how important all this information would have been to investors, it is useful to note that at the close of trading on September 11, 2002, the market capitalization of Lantronix was roughly $38 million dollars. The range of possible losses from the pre-announcement was $15 million ($60-$75 million). Had investors expected Lantronix to experience a loss in the middle of the range ($67.5 million), they would have been disappointed because the actual loss was $5 million higher ($72.5 million). The unexpected loss of $5 million corresponds to 13.31% of the market capitalization of Lantronix. In other words, the unexpected loss itself could account for most of the abnormal return of Lantronix on September 12, and, when taken together with the other information in the September 12, 2002 press release, could account for the entire abnormal return that day.

Stulz Aff. ¶ 34 (citation omitted).

Second, Ms. Preston acknowledged that "under circumstances where there is more than one piece of information [in the market] and one is determining which one of those pieces of information had an effect on stock prices . . . it make[s] sense to look at newspaper articles . . . to determine whether or not the market viewed one of those two pieces of information as being more important to an effect on the stock price." See Preston Hrg. Tr. at 165. Thus, it is particularly persuasive that the Bloomberg News reported the Lantronix September 12 release as a "negative earnings surprise." See Lifeso Aff., Ex. H. There was no mention of the article in THE NEW YORK TIMES. Accordingly, for all these reasons, the Court finds that the reports at issue had no impact at the end of the Class Period.

IV.  Conclusion

For the reasons set forth above, the Court finds that Plaintiff has not carried his burden of demonstrating that each element of Rule 23 is met. Accordingly, Defendants' Motion for Reconsideration and to decertify the class is granted. Counsel shall confer and appear for a Pre-Trial Conference on April 28, 2008, at 9:00 a.m. in Courtroom 12A, 500 Pearl Street.

DATED:    New York, New York
          February 26, 2008

                                    _Loretta A. Preska_

                                    Loretta A. Preska
                                    United States District Judge

30

APPEARANCES

MURRAY, FRANK, & SAILER LLP
Lead Counsel for Plaintiff and the Class
275 Madison Ave., Suite 801
New York, New York 10016

        GREGORY LINKH, ESQ.
        BRIAN P. MURRAY, ESQ.

                Of Counsel

WEISS & LURIE
Lead Counsel for Plaintiff and the Class
551 Fifth Ave.
New York, New York 10176

        MOSHE BALSAM, ESQ.
        JACK ZWICK, ESQ.

                Of Counsel

DAVIS POLK & WARDWELL
Attorneys for Defendants Credit Suisse
Securities (USA) LLC and Kevin McCarthy
450 Lexington Ave.
New York, New York, 10017

        AVI GESSER, ESQ.
        LAWRENCE PORTNOY, ESQ.

                Of Counsel